Case number 20-1594, Fisheries Survival Fund et al, at balance, Garden State Seafood Association versus Scott de la Vega, Acting Secretary of the Interior et al. Mr. Frula, for the balance. Mr. Smeltzer, for the Eppley's, Secretary of the Interior and Bureau of Ocean Energy Management. Mr. Super, for the Eppley Equinor Wind U.S. LLC. Go ahead. Good morning, Your Honor, and may it please the Court, I'd like to reserve two minutes for rebuttal. I think I had 10 altogether. We represent the fishing communities, associations, and businesses whose interests were immediately adversely affected by the lease of an area offshore New York for offshore wind development, twice the size of the District of Columbia. The lease was made by the Eppley's Secretary to the appellant, Eppley Intervenor Equinor. On December 8, 2016, we filed suit to enjoin the lease auction for this wind farm under NEPA and the Outer Continental Shelf Lands Act. The final sale notice had been published on October 31, and the lease sale had been set 45 days later. The government and the intervenors have argued, and the District Court below concluded, that the lease and the lease auction were, legally speaking, a non-event, and on that basis disposed of our NEPA claims on ripeness and our OXLA claims on failure to provide 60-day notice. The District Court erred on both counts. It's simply not the event. The lease program is the main purpose of 43 U.S.C. 1337 P.1, the Energy Policy Act Amendments of 2005, specifically set up leasing as the signal element of this, the new program to provide authority for BOEM to conduct offshore leasing, and subsection 1337 P.4, which provides for consideration of impacts on other users, specifically applies to any activity, and certainly a lease is any activity. The court found we had standing, but barred the claim for failure to provide 60-days notice, and the fundamental issue here is that BOEM pushed the lease sale through during a presidential transition. There was only 45 days between the final sale notice and the lease auction. Generally, yes, claims under the OXLA are supposed to be provided 60 days in advance, but there's an exception set forth at 43 U.S.C. 1349 A.3 for a legal interest immediately affected. Under OXLA, the appellants have a legal interest, and their residents have legal interests in fishing and navigation. That's expressly set forth in this. The problem for you is the right misdisposition on the first part of the case really is damaging to you on the argument that you're making now. Nothing has been done to affect what you're complaining about, which is the possibility of wind farms. That has not been granted. This is a right to first refusal, as has been said. It seems to me the record is absolutely clear on that. They have not been granted permission to do what it is that you complained about. They have not. Another way to put Judge Edward's question is, why isn't this case totally controlled by Peterson? That's what he's asking you, basically. I mean, this is exactly like Peterson. Well, Peterson needs to be here. They said there, you know, the question in that case was energy lease. It's different there. But they said, our court said that they didn't mature. They weren't triggered. I'm quoting from Peterson. If the lease reserved to the government, both the authority to preclude all activities, pending submission of site-specific proposals, and the authority to prevent proposed activities if the environmental consequences were serious. That's this case. And that makes perfect sense as applied in the oil and gas leasing case. How could it be different for discount lease? Because in the offshore wind... I'm sorry? I mean, that's like saying the name of the case is different. There are three principal differences, though. The first is the difference in the investments that go in before any decision is made on the construction. Constitutional principles here. That's what we're talking about. We're talking about ripeness. It doesn't turn on the amount of money that's invested. It turns on whether or not there's injury at this point. Whether or not there's any obligations that have been triggered. Well, the court, under ripeness principles, also can consider hardship and needs to look at the actual facts that Boehm was confronting. In this instance, hundreds of millions of dollars are going to have been spent on leases, on site assessment, on construction and operations plans. I'm sorry. I thought you said in your brief it was 42 million. It's 42 million plus the costs for site assessment and construction and operations plans. That's all the costs that will be incurred before Boehm makes any decision whatsoever under NEPA beyond simply a decision on the site assessment plan that we've already seen within EA. And what we're saying is that it defies reality to think that after you have gone and spent all that money, made all those years of investments, that Boehm is going to turn around and say at that point, wow, we really put this lease in the wrong place all along. That defies reality. And that's the tension here. I can understand that Boehm did not want to have what happened to Cape Wind happen again, where they ended up in years of litigation. They restructured their processes. They restructured their lease forms. But the court can and shouldn't look at this and not acknowledge reality. And the other point that the appellees are making is that this is simply a right of first refusal, as you said, an exclusivity point. But exclusivity alone doesn't solve the issue. I could say to you, Your Honor, you would like to buy one Powerball ticket and you're the only person in the country that's going to buy that Powerball ticket. You're not going to do it because you spend $43 million to buy it. You're still not going to buy it because you need to get all six numbers right. There's an exclusivity needs that comes with expectations. How's that different from Peterson? I'm sorry? How is that different from Peterson? In Peterson, there are hundreds of oil and gas leases that are issued at the same time. The costs up front are fundamentally different. It's just a fundamentally different set of leasing criteria and leasing standards. You're not spending hundreds of tens and hundreds of millions of dollars up front. And those practical realities have to find the way into the court's analysis at some point, because what we're saying fundamentally is the most important issue to the stakeholders in the fishing community, the most important issue is the location of the lease. And the location of the lease is not going to be considered in any sort of detailed way until the construction and operations planning. And what we're saying is that if you do that, you're never going to get a fair shake. You're never going to get fair consideration of the location. And this location was decided back in 2011 when- Why? Because you think the government agency wouldn't have the guts to back away when at the next stage, they were convinced that this cannot be justified. I mean, that's the heart of your argument. We can't trust the government. Is there any case that says that we can't trust the government? No, there's no case that says that exactly. But you also happen to have a situation where, again, the leasing process has been- Boehm went and it looks to me like they went and they read Peterson and said, let's set this up. This way so that we can fall under Peterson. That's great. But what they've done is they've turned the oil and gas leasing process on its head. Because normally in the gas context, leases are- EISs are conducted at the lease phase for non-surface occupancy leases where the presumption is that there's generally going to be an EIS. And the same thing should hold here is that you can't just say that everything is an exception to the general rule that with leases, there should be a fulsome consideration of the location up front. Are your clients currently still fishing in their fishing areas? Has that been disrupted? They're currently still fishing in those fishing areas, yes. It hasn't been disrupted yet? It hasn't been disrupted yet. What I'm saying is that these matters need to be dealt with up front. It's just fundamentally different. Right. Your position seems to be that as a practical matter, at some point before, assuming there is an approval of the construction and operation plan, at some point before that, the agency will have made a firm decision to allow some amount of service disturbance or at least enough construction disturbance that's going to actually impair these fisheries, right? No. No, we're not making the argument about the site assessment plans. What we're saying is- When I say assessment, I'm talking about- I thought your argument was, come on, we all know the forward momentum isn't going to be stopped at this point, at least in the way that you want, which is a wholesale ban on- I take it you guys want a wholesale ban on fishing in this entire area? What we want was- Not fishing, I'm sorry, a wholesale ban on construction of a wind farm in this area. What we want is a fair, full and fair environmental consideration of fishing there. We never said we wanted a ban. What we said was we wanted the analyses to be conducted. We think if the analyses are conducted in a fair way, that BOEM will look someplace else to lease. So you're- All right, so just to clarify then, so your position is that if a full environmental assessment is done, it's not that they could adjust something about the construction to sort of balance where they put the wind turbines, but that in fact there's no way to adjust the construction plan or to modify a construction plan that wouldn't have overwhelmingly deleterious effects on the fisheries? We're saying that there's no record basis to show that it won't. No, but I'm asking a predicate question, and that is- because for me at least it's relevant, and that is if the question here is, look, once they- they've got to do this comprehensive study, and once they do, they'll be able to tailor this project in a way that will balance the power interests and our fishing interests. That's one approach. Another one is they need to do this comprehensive study because once they do, it's going to reveal no balancing in the construction operation process is going to work. Having a windfill mill farm here at all is going to irrevocably and quite seriously damage our fishing. Which of those is it? It could be either. It could be either. It could be either. It could be that some- that it could- that you could set it up someplace else, partially or more fully, but that was never- that was never analyzed in any- in any- You're saying you understand you can lose it, but you feel like it is so important that it must be done, and if it's done honestly, we'll see what happens. That's what your argument is. That's what our argument is. Okay. And then- Well, I don't say- again, I'm not making honesty allegations. No, no, I- that- that was- that was just- No, I just want to make sure- Don't overread that word. You're saying you're entitled to an honest process. We're entitled to a process where the dice aren't loaded against us. That's exactly- I understand. Okay. Okay. Anything else? No, thank you. Okay, thank you. We'll hear from the government. Good morning, your honors. May it please the court. John Smeltzer for the Bureau of Ocean Energy Management. Your honors, we believe the district court's judgment should be affirmed because the plaintiff's claims are not right, and because plaintiffs failed to comply with OCSLA's 60-day notice requirement. With respect to NEPA rightness, I think the court understands our argument. It is based on Peterson, and the argument is that Peterson controls. And Peterson controls because the lease in this case does both things that Peterson identified as necessary to do in order to delay or defer NEPA analysis. And when both those things occur, then there has not been an irreversible and irretrievable- What about counsel's argument that when we look at rightness, we also look at hardship, and the hardship situation here is just dramatically different than the oil lease situation? Well, there is no hardship until the construction and operations plan is approved, of course. No, that's not- No, the hardship is that they can invest $42 million if they're going to lose. Right. Well, if you're talking about- He's making a perfectly plausible argument. The likelihood that are getting what the law, in their view, requires, that is a fair assessment of the project, full and fair assessment, is dramatically reduced when this much money is being put into it at the front end. And that is a perfectly plausible argument. This is millions and millions of dollars. I'm sure the three of us preparing this case separately scratched our heads and saying, right at first, that many millions of dollars, and you may just go down the tube. They're saying, no, they're not likely to go down the tubes. And that's exactly our concern, that we are entitled to a fair process now. Sure, Your Honor, but this process was transparent from the beginning. The terms of the lease were known- But they're saying it's- No, they're saying it's transparently unfair because you were allowing someone who was investing millions and millions of dollars to get a foot in the door, and this claim of right of first refusal is a joke, in their view, because the likelihood of their prevailing now, having invested so much, is really great. Well, Your Honor, as I think the court mentioned, there is no law that says that you pay more for the lease, and therefore you need to do an EIS if the lease meets the Peterson factors. And what I was trying to say is that there is a presumption of regularity, of course, with how the government operates. And the government was, in Bohm here, was perfectly transparent in the terms of the lease and in identifying the risks throughout the stage, throughout the process, prior to the lease, and identifying to the potential bidders, the risks that existed with respect to potential impacts to fisheries. That was transparent, identified throughout. If there had been a well above the amount that was bid on this lease, the lease does not have a guarantee. There is, of course, a sense on the side of the folks that bid that there is a true prospect here, and they are bullish on the opportunities. But Bohm did not guarantee anything. The lease language is perfectly transparent that if there are conflicts under the Oxlade provisions, under section 1337 P4, and if Bohm determines that there are unacceptable levels of environmental consequences in that context, that a development plan will not be allowed. Go ahead, finish your sentence. I'm sorry, you had a button. I was just going to say there is the ability to examine different alternatives on this leasehold and to mitigate impacts. One of the things Bohm determined when they identified this area and decided to go forward with the entire area and not cutting off particular areas from the beginning was that this would not necessarily cut off all access to all fishing. There are ways to mitigate impacts and do different things. What Bohm said is we need to study those first in an environmental impact statement, and that's why we're going forward with this area. One of the arguments, though, is that it's not going to work. You just can't do it in this area. These things are too big. You're not going to be able to tweak it and adjust it here and there. These things are too massive, and you haven't seriously considered just doing it somewhere else completely. So I get that you're saying that we can do our environmental study, and we can maybe rejigger things and adjust things and ban it a little bit here and make the pylon go over there. But I want to ask the foundational question of whether a wind farm should be built in this 127-mile square area period. Is that part of what will be reconsidered at the construction and operations study stage? Absolutely, and that's part of the two parts of the Peterson test. It's preserving not only the ability to pre-approve or to approve any site-specific plan or any ground-breaking activity. All oil and gas leases, all federal leases in this area generally have that provision. The government, the lease itself doesn't allow the ground-breaking activity. The government has the opportunity, the agency has the opportunity. You have the opportunity, but how? But in this lease, well, I'm sorry, I don't mean to talk over you, but this lease has the second part, right, where it has the second provision that specifically matches what is said in Peterson. In addition to reserving that pre-approval, BOEM here has reserved all of its authority, all of its authority under OXLA, all of its authority generally to say no to the project if it will have unacceptable environmental consequences, and that's the difference between this lease. Okay, that's important, but my other question to you is what if the Bureau says go forward and then a court upon reviewing the environmental impact statement says you've considered doing it somewhere else completely and all this money has gone into it, maybe construction has even gone forward at that point? It's a very separate question of not whether, just whether the Bureau could decide, but what's the Bureau going to say when a court says vacated and all that money and effort has gone in? Is the government going to agree that's perfectly legitimate thing for the court to do because we had no commitment and this company can't depend on there being a commitment? This is a rightness case, and so yes, that's the position we're taking. We're taking the position that... You've had this before. I mean, Judge Edward asked for a case. I've been on a case with Judge Tatel before where the government came in and said, don't say anything, don't say anything. We promise that if you find serious enough flaws in our environmental impact study toward vacature, we'll be able to undo everything then. And then when we found very serious flaws in the environmental impact study that warranted vacature, the government and the company came screaming in, don't vacate, don't vacate, look how much has already been invested here. And how do we know that's not what's going to happen as a practical matter under these types of leases, the way this is arranged? That is my real concern. Right. Well, first of all, there will be no construction and operations activities until there is the full NEPA EIS process done on that. No, that's good full judicial... I get that you might come back and say, don't do it. I'm concerned about what this process is going to allow is that our ability to do anything other than go along with an EIS or say remand, but we're not going to vacate because so much literally water here is under the bridge or under the turbines, whatever you want to call it. So much water is so much has already been done. It's just, it's too much for us to give them the relief that, not to put words in their mouth, but if their argument is you can't do it here at all, that decision is no longer on the table. So what I want to hear from you is not that you're not going to make the decision until you think you've done a sufficient environmental impact study. What I want to know is what's the government going to say if the court, and it may never happen to be clear, but if the court disagrees and it's the type of error that warrants vacature, isn't the reality going to be that you're going to pose vacature just like you did last time on the grounds that too much has already been invested? Right. Well, I guess the point I was trying to make, your honor, is right at the moment that the environmental impact statement is completed and BOEM makes a decision to approve or disapprove the construction and operations plan, it is at that point that if there are serious flaws, Mr. Froehlich can come into court at that point and bring a new case. And it's that case. Let me just pick up there because I have the same concern, Judge Millett, but I've actually taken a different lesson from the James River case that she's mentioning, and we just had another one last summer with Stanley Rock, the oil pipeline that goes from Idaho to the Midwest. In both those cases, we had defective environmental impact statements, yet the construction was proceeding. The lesson I take from those two cases is that this court ought to be entering injunctions whenever anybody makes a serious challenge to an environmental impact statement, we ought to be enjoining the construction. And when we do that, the government agencies are going to scream bloody murder, right? They're going to say, oh, no, no, don't enjoin the construction of the project. We can fix the defects. That's what's going to happen. Judge Schoenel, that's the question for the next case. There's no way for me to stand here and tell you what the defects in the environmental impact statement are going to be. You're talking to a court that's had some serious experience with this problem in the past few years. And the lesson I've taken away from this is that we ought to be very serious about enjoining the construction of these projects when someone makes a serious claim about the adequacy of the environmental impact statement. That's the point to prevent any future, the kinds of things we face in the James River and the Sandy Rock. I might disagree with that as an across-the-board determination, but again, it's a determination for the next case. I understand. I'm just letting you know what my reaction is to all this. Understood, understood, your honor. The difficulty here is, of course, we don't have the record before us of what are the impacts on these fisheries. What kind of limitations on access will there be? What kind of impacts on their return on their fishing licenses and their ability to fish will there be? What kind of mitigation can there be? Until all of that is sorted out through a robust environmental analysis, which BOEM still has to do, it's very difficult to talk about should there be an injunction or not. And of course, I'm not going to agree on half of the government that all projects should be enjoined. I wasn't asking you for that. Come on. That's not the point of my question. The point of my question was to try to explain to you why at least two members of this panel who have just had these cases are concerned about the implications of these. That's all. I take your point. My client will understand your point in case about rightness. And it's a question about whether a NEPA claim should be heard by this court right now before the fulsome analysis is done. And the Peterson precedent is clear. It controls. So my understanding is this case has progressed while the litigation has gone on, which has been the problem in the past as well. And that you're already at the construct, reviewing a construction and operation plan. Is that correct? As my understanding is, there is a plan that was submitted. Mr. Super may have they've already submitted today. There has not been a release of an environment impact statement yet on government is actually going to do an environmental impact, a full EIS for that. That's my understanding. Yes, your honor. Okay. Anything else with the government? Does the government agree with the government agree? Because the difficulty here is this, you know, litigation, sorry, if I'm correct, has to go through a district court and this up to this field, this court too. And so that means there's a lot of time and a lot of construction that can happen again, before they're ever going to get this fundamental question that I take to be the heart of their objection is that it shouldn't be in this area at all. It's going to get resolved to go forward while there are challenges to the EIS. And, and bomb has not, you know, made a decision that construction can go forward, right? So that it's a, that's the fundamental point about this case and why it's not right. If foam does make a decision, the government and it's challenged, right, then it will depend on nature of the challenge. And, you know, the merits of the challenge, and we'll just have to assess it at that point. Well, let me put it this way. Assuming, obviously, assuming they comply with all your regulatory legal requirements, it's easy if they don't. But assuming they meet, they comply with all those, their plan complies with all of those, if it does, is it at least predictable that a wind farm will be built in this area? Because we don't know the precise contours, but if at least they comply with regulatory requirements, is it predictable that wind farm will be built in this area? Your Honor, I'm not going to handicap the likelihood of construction. Home hasn't decided. And I'm also not going to say that it's not predictable, even if they comply with all the regulatory requirements. Right. But when you say, when you say whether they comply, I mean, there's compliance in the form of providing all the relevant information to assess the impacts. But when you're talking about the statutory factors under Section 1337 P4, you know, in terms of balancing impacts on fisheries versus the, you know, the benefits from the wind farm and, you know, other uses of the area and all those sorts of things, it's not a mechanistic, you know, checking. I'm just asking, is it predictable that that could be the outcome? I'm certain. No, you're not agreeing. You're not. Of course, you're not signing off on anything. BOEM would not have leased this area, right? Would not have chosen this area to offer for a lease and to give Equinor an exclusive right to present a construction and operation plan if BOEM didn't think there was a decent possibility that the project would go forward. It wouldn't be in good faith to do so. So for sure, the industry is bullish on the possibility and BOEM leased this area in the view that there was a good chance that, you know, they could find a way of making this work. But I feel like you're trying to walk me into, you know, providing some sort of guarantee. I am not. I want to be absolutely clear. It's not what I'm trying to do. I'm just asking about, is it at least predictable? And I asked that, and I thought it sounds like it is. You're not signing off. You're not guaranteeing. There's got to be some sort of serious, reasonable possibility that this is going to work here. No guarantee. Yeah, sure. BOEM wouldn't have not put the area out for lease without doing the threshold, you know, review determined. And that's what I, that's the point I was making earlier. It's in the record that there's potential fisheries impacts. And the extent of those potential impacts is in the record. The request of Mr. Fuller's group to isolate and to set apart particular areas of the lease because of particular impacts on scallop and squid fisheries has been identified in the record. So those risks are out there. The potential risks are out there. BOEM looked at it all and determined at the leasing stage that they didn't preclude putting out a lease in this area because there were potential ways to mitigate those impacts. And because in the end, it could be determined that, you know, this would, could be the right place for a wind farm. But reserving all the judgment under the statute and to do the analysis. Let me, let me just ask you a quick, maybe I missed this point earlier, but it's a next step, a site assessment plan. That has been done, Your Honor. It's a site assessment plan. Why isn't that an irreversible, irretrievable commitment? That's not true. It could be if Mr. Fuller's group had challenged the impacts of the site assessment. The site assessment was essentially, you know, setting up a weather buoy and some limited equipment. And there was never any challenge as to the, I mean, so short, the impacts of putting out that, that equipment to do site assessment have, you know, have happened. Those, those were done, but those weren't, those, that was, and it's the final point, the lease and the regulations treat site assessment the same way as construction and operations. That is, you need the approval. And if at the point a site assessment plan is presented, there's no way of proceeding without having unacceptable consequences. You know, BOEMs reserve that authority as well, but we have gone past that stage. I take your point. Judge Millett or Judge Edwards, do you have any questions? No. Okay. We'll hear from the intervener. Thank you, Your Honors. Equinor, three minutes. May it please the court, David Super on behalf of Equinor Wind. Judge Edwards, I think you, I think you hit the nail on the head when you referred to Pellon's argument as effectively being, you can't trust the government because I think that's what they're saying. There's no question that, that BOEM has the full authority under the lease to reject any activity in the interest in terms of constructing a wind farm. And that, that BOEM will conduct a full and complete NEPA analysis at the construction and operation plan stage. And frankly, there will be zero harmship because all of the stakeholders, including the appellants will have a full opportunity to participate in that process. So the assumption that the agency will not go through that process, I think is the exact incorrect assumption. We should assume that that BOEM will comply with its DEPA obligations. And I think I'd like to address this notion that Equinor obtaining approval to actually build a wind farm in the lease area is somehow a foregone conclusion because Equinor has invested resources in the lease. I don't think anyone says foregone conclusion. I can't speak for my colleagues, but as I understood their questions in my comments, no one says foregone conclusion. Okay. But for our purposes, at least for now, is it at least a reasonably predictable consequence? I got to assume you wouldn't have done this if it wasn't, you know, reasonably predictable that this could all work. You've got to dot your I's and cross your T's and get all your ducks in a row, which I'm sure your tell you in utmost sincerity is that my client recognizes the risk involved in this project because BOEM does retain the authority to preclude any construction activities. My question is different. It's not that there's zero risk. How reasonably predictable is it that I assume you submitted a construction operation plan that in your view fully complies with all regulatory requirements? We did. We did. Because of the risk, actually, BOEM, Equinor has spent years developing a construction and operation plan for submission to BOEM. And when that plan is subject to review, BOEM, other agencies, the public, really all stakeholders, including the appellants here, can assess the impacts of that construction plan, and BOEM can decide based on the OXLA factors and based on a full NEPA analysis whether it's to let that plan go forward or not. Yes, Equinor has confidence in the plan. Of course, it invested money in it, but that is not to say that it does not recognize the substantial risks that this project may not go forward. And I think it's important to keep in mind that all of the commitments, financial commitments that have been made toward this project do not include BOEM. I have full authority to review the construction and operation plan, assess it under NEPA, assess it under the OXLA factors, and decide whether that plan should be allowed to go forward. So these commitments are commercial commitments made by Equinor, made by the state of New York, but they all recognize that it's up to BOEM to decide whether this project can go forward. And those commitments have not been made by BOEM. I think the place to look for the plain language of the lease, and I agree with the court that Peterson really is on all fours with this case and it is controlling here. I see my time is up. It's an odd lease because it has that language, but it also has a 25-year operating term. What's up with that? Well, what's up with that, Your Honor, is if the plan is never approved by BOEM, then that operating term, that term will be rendered fairly meaningless. I mean, you know, Equinor right now has a... It seems a lot for this lease to... It has a preliminary term, a site assessment term, and then an operations term, and it goes in great detail about operations and payments and... Certainly. More mathematical formula than I can understand. Certainly. That seems an awful lot of work to put into a lease that isn't making any decision. Well, it's making a decision to grant to Equinor a right of first proposal. Equinor has the exclusive right to submit, to do site characterization, which it did, to submit a site assessment plan, to submit a construction and operation plan. The lease provides for a term if that plan is approved, but crucially, the lease reserves to BOEM the full authority to prevent any construction in the lease area. And if I may, on the Oxla ripeness point, I think it's really important to recognize in answer to your question, Judge due to the lease auction was being precluded from entering the lease area and fishing there. And of course that hasn't happened because at this point, with no construction and operation plan approved, Equinor has no right to exclude fisheries from entering the lease area. They just don't. So there has been no immediate effect whatsoever as a result of the lease auction. So Judge Tuchin was absolutely correct in her analysis on the Oxla. All right. Are there any other questions? Because we're well over time. Okay. Thank you. Thank you. Mr. Fuller, you were out of time, but you can take two minutes. Thank you. Thank you, Judge Tatel. Yes. The first point I'd note is that Oxla is not controlled by Peterson. The Massachusetts Viandris case looked at Oxla considerations at a point of considering offshore gas drilling under a similar provision. So I believe those two claims don't rise or fall together. A property right is granted at the time. We made the decision to file within 60 days because at the point of the lease sale, that's when rights started to accrue. Do you have anything more you want to say about Peterson or the rightness issues? A couple of points. The first is that the BOEM has only looked within the footprint of the lease. Any analysis conducted since the unsolicited bid was accepted back in 2011 has looked within the footprint of the lease. The second point is expectations and reality matter. The court decided Peterson, but the court also, you're an appellate court, and you have the right to look at Peterson and consider them the facts and circumstances of these cases. And in terms of impacts and expectations, expectations and reality matter. New York State has contracted to buy power out of this area already. So it's just, it's, there's a hardship. It's not a fair consideration. Okay. All right. Anything else? No, thank you. Okay. Thank you. The case is submitted.
judges: Tatel, Millett, Edwards